FILED
3/15/2021
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

DONALD WILLIAM WINSOR,

Appellant.

No. 80373-5-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, C.J. — Donald Winsor appeals his convictions for rape of a child, child molestation, and communicating with a minor for immoral purposes. He argues that the trial court erred by ruling that the videotaped interview of the child victim, B.D., was admissible at trial. But even if inadmissible, any error was harmless. The jury heard Winsor's detailed videotaped confession which was corroborated by B.D.'s sister's eyewitness account.

We affirm.

## FACTS

In November 2017, 5-year-old B.D. lived with his mother, grandmother, and 11-year-old sister, M.B., in Enumclaw. Winsor, then 69 years old, lived next door to B.D. and his family. Winsor and B.D.'s grandmother were close friends and often went for

Citations and pin cites are based on the Westlaw online version of the cited material.

walks together in the neighborhood. Winsor also became "best friends" with B.D. B.D. had a standing invite to visit and would often wander over whenever he felt like it.

On November 20, 2017, B.D. was visiting Winsor at his house. B.D.'s sister, 11-year-old M.B., went to Winsor's house to get B.D. for dinner. She did not see B.D. or Winsor in the kitchen or living room, so she proceeded towards Winsor's bedroom. Standing outside Winsor's bedroom, she saw B.D. laying on the bed with his pants down and no underwear. Winsor was on top of B.D. and was licking B.D.'s penis.

M.B. returned home and told her grandmother what she had seen. She then returned to Winsor's house and knocked on the back door; Winsor and B.D. came to the door, and M.B. and B.D. went home. The next day, B.D.'s mother reported the incident to the police.

The next day, B.D. and M.B. separately met with forensic child interviewer Alyssa Layne. The interviews were videotaped. In his interview, B.D. stated that he was playing "hide and seek with your pants down" with Winsor. B.D. said when it was Winsor's turn to hide "he hid right in his bedroom" and finding him was easy because "he's just laying on the bed." B.D. said "Don said part of the game is pulling your pants down." He said Winsor "just wanted to play with my weanie and that's all." He said Winsor "just wiggled it around" with his fingers. He demonstrated the hand motion that Winsor used when touching his penis. He said Winsor "told me that he didn't want anybody to know" about their game.

Winsor was arrested that same day and charged with first degree rape of a child, first degree child molestation, and communicating with a minor for immoral purposes. The police interviewed Winsor after his arrest. The interview was videotaped. Winsor

2

confessed to performing oral sex on B.D., as well as other sexual contact and communications.

After a pretrial hearing under CrR 3.5, the trial court determined that Winsor's recorded interview was admissible. Also prior to trial, the State offered B.D.'s recorded interview as evidence arguing that the recorded statements were admissible under a statutory hearsay exception for disclosure of sexual misconduct made by a child under 10 years old. RCW 9A.44.120.[1] Winsor objected on two grounds: (1) that B.D. was not competent to testify at the time of the interview and (2) that B.D.'s statement lacked the necessary indicia of reliability required under RCW 9A.44.120 and State v. Ryan, 103 Wn.2d 165, 691 P.2d 197 (1984). The trial court concluded that B.D. was competent to testify and that his videotaped interview had sufficient indicia of reliability.

Trial took place in May and June 2019. Pursuant to the court's pretrial rulings, both B.D's and Winsor's videotaped interviews were played for the jury. Winsor did not testify. B.D. testified that he did not know if Winsor ever touched him inappropriately and did not remember Winsor touching him with his fingers or mouth. M.B. testified as to what she saw on November 20, 2017.

The jury convicted Winsor as charged. Winsor appeals.

---

[1] RCW 9A.44.120(1) provides:
"A statement not otherwise admissible by statute or court rule is admissible in evidence in…criminal proceedings . . . if
(a)(i) It is made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another . . .
(b)The court finds . . . that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
(c) The child either . . . [t]estifies at the proceedings; or. . . [i]s unavailable as a witness . . .

ANALYSIS

Winsor contends that the trial court erred in concluding the recorded interview of 5-year-old B.D. was admissible under RCW 9A.44.120 and Ryan. The State argues that the trial court did not err, but even if it did, any error was harmless because there was overwhelming evidence of Winsor's guilt. We agree with the State that even if there was error, the error was harmless.

Because B.D. testified at trial, Winsor's right to confrontation was satisfied. See State v. Price, 158 Wn.2d 630, 650-51, 146 P.3d 1183 (2006).[2] Thus, any error in admitting B.D.'s hearsay statements was not of constitutional magnitude. State v. Warren, 55 Wn. App. 645, 650, 779 P.2d 1159 (1989). A non-constitutional error warrants reversal "only if there is a reasonable probability that the error materially affected the outcome of the trial." State v. Kindell, 181 Wn. App. 844, 853, 326 P.3d 876 (2014).

To find Winsor guilty of first degree child molestation, the jury had to find that he had "sexual contact" with B.D. See RCW 9A.44.083. To find Winsor guilty of first degree rape of a child, the jury had to find that he had "sexual intercourse" with B.D. See RCW 9A.44.073. To convict Winsor of communicating with a minor for immoral purposes, the jury had to find that Winsor communicated with B.D., a minor, "for immoral purposes." RCW 9.68A.090(1). For purposes of this statute, "communicate" includes conduct as well as words, and "immoral purpose" refers to sexual misconduct. State v. Falco, 59 Wn. App. 354, 358, 796 P.2d 796 (1990).

---

[2] In Price, the Supreme Court concluded that out-of-court statements made by a 6-year-old victim of child molestation were admissible and satisfied the purposes of the confrontation clause because the child testified at trial and was subject to cross-examination, despite the child's inability to recall the events.

Any error in admitting B.D.'s videotaped interview was harmless because Winsor confessed, on a videotape shown to the jury, to sexual contact and sexual intercourse with B.D., and to communicating with B.D. for the immoral purpose of sexual misconduct.

As Winsor explained:

Well, it started earlier this summer, just sort of messing around, and one day he came in and I sort of masturbated him. And then that led to, he said, oh well, you can put—you can put it in your mouth, if you don't bite it. So, okay. So that was—went on for—I mean, the one time. And all of a sudden last week, last weekend in fact, he was wanting me to play with him and to put it in my mouth and he—next think you know, the next day he comes over, he wanted it done again. Well, okay. So then Monday he came over and we—I kept telling him, we can't do that. We can't do it, but he was wanting it. Oh, he said, it feels good, so . . . And like I say, that's—then Monday—pardon me—Monday he came over. He said—asked me if we could go to my bedroom. Oh, okay. Bedroom. Well, anyway, his sister came in to get him and she—she was in the kitchen. We were in the bedroom. So that's when, I think, that she knew something was going on. So she went over, told Grandma, and then when he went home, evidently he thought (unintelligible), so, and he told. Because I told him before, I said, well, you can't tell anybody. Oh, no, he says, I won't tell anybody, you know, and that's—that's all—all that was led up to it.

Winsor admitted he knew B.D. was "only five."

Winsor was later asked by the officer to "walk me through, through the first time, how it led up and . . . kind of what happened, the whole picture." Winsor responded,

Well, he was—like I say, he was coming in and I just sort of said to him, I asked him, I said, well, if you don't want me to do anything, let me know . . . . Well, then, oh, okay. Well, then next thing you know, then he pulls his pants down and I—like I say, I was just playing with him and then all of a sudden it led to, like, well, well, gee, if you want to, he says, he says, but don't bite. So that's— that's more or less what—what happened there. And like I say, I told him, I said, we can't do it . . . That's it. Well, then, all of a sudden, I say, this—I said a couple days ago or so, he wanted—he had to have it done, so—well, he didn't have to. I mean, I didn't have to do it, but I did, which is wrong on my part. It's like, and then he kept

5

wanting it done. Well, stupid me, I kept doing it. So, I'm—like I say, I know I shouldn't have.

The officer asked about the first time it happened and whether Winsor or B.D initiated it. Winsor responded that it was "more on my part . . . because he was sort of hesitant about it. He didn't really. And then, but then after and it was all right with him. And in fact, like I say, he was wanting to—he was wanting me to have oral sex with him even after that, the next day, or whatever, and I told him, I said, [B.D.], I can't."

The officer then asked when it first happened "did you give him oral sex or were you just touching him with your hands?" Winsor responded,

> The first [time] I was just touching him with it, with my hand. I was just sort of seeing, like maybe seeing how far I could go and then—and then all of a sudden, then like I say, then he sort of like, oh, well, then—then he sort of, like say, well, if I—well, as long as if you don't bite it, he says. And it's like I'm thinking, well, you know, I wonder if he's ever had it before. I mean, it just seemed sort of strange that all of a sudden he would say that . . . Because, I mean, he wouldn't know. Why in the heck would all of a sudden he say something like that?
> So, it was like, you know, sort of a two-way street, but of course it's my fault for doing it."

Winsor explained that he was "sort of like grooming him a little bit, but not really too grooming him. It just got to a point where—I don't know. I just, I just, I mean, like I say, I know damn well I shouldn't have done it. I was told before not to do it."

Two days before Winsor's interview, Winsor explained "[T]he last time, which was, like I say, a couple days ago, Monday, it was his sister had came into the kitchen and she hollered to him. And so anyway, he rolled off the bed and put his pants up and what have you. And so I guess she—she knew something was going on then." Winsor further explained that on Monday B.D.:

> hid behind the chair, but I knew he was there, because he always laughs and makes himself . . . So then he goes, goes into the bedroom and gets

6

under the bed.  And so anyway, I was getting ready to watch football, I think it was, and he comes in on the couch and he says, do you want to go—do you want to go to the bedroom, and I says [sic] yeah, okay.  And that was he gets on the bed, pulls his pants down, and I proceed to give him oral sex.

M.B.'s testimony corroborated Winsor's confession about November 20, 2019.  M.B. testified that, standing outside Winsor's room, she saw B.D. laying on the bed with his pants down.  She said she could see B.D. from the waist down and B.D. did not have underwear on.  She said Winsor was on top of B.D. with his clothes on.  She said that Winsor was licking B.D.'s "thingy," or "dick."

In short, Winsor's gave a detailed and comprehensive confession of sexual contact and sexual intercourse with B.D., as well as communicating with him for the purpose of sexual misconduct.  He does not challenge this confession on appeal.  Winsor's confession was corroborated by M.B.'s eyewitness testimony.

Thus, even if it was, arguendo, error to introduce B.D.'s interview, there is no "reasonable probability that the error materially affected the outcome of the trial." Kindell, 181 Wn. App. at 853.

Affirmed.

_____
Mann, C.J.

WE CONCUR:

_____          _____
                                  Appelwick, J.

7